HEARD NOVEMBER TERM, 1877.

## WILLIAMS & CO. *vs.* VANCE & MOSELEY.

V. & M. agreed to consign and ship to W. & Co. 500 bales of cotton, to be sold by them as cotton factors, on commissions of 2½ per centum, and to pay as liquidated damages $2 per bale for every bale of cotton less than 500 bales which they might fail to consign and ship to them as stipulated: *Held*, That the $2 per bale were liquidated damages.

Covenant between V. & M. on the one side and W. & Co. on the other as follows: W. & Co. agreed to make certain advances to V. & M., to be paid at a future day, and V & M. gave their mortgage to W. & Co. to secure the performance of their covenants. Other debts for advances not secured by the mortgage were afterwards contracted by V. & M. with W. & Co. Payments were also made on general account before the mortgage debt became due,—nothing being said as to how they should be applied: *Held*, That the payments were not applicable to the mortgage debt alone, and that the account should be taken by carrying the payments into the general account of debts assumed and advances made, leaving the balance at the foot of the account to constitute the mortgage debt.

The question whether damages covenanted to be paid on failure to perform defendants' part of the contract are liquidated is one of intent merely; and where they are called "liquidated damages" in the contract itself, they must be so *held*, unless such construction is inconsistent with other parts of the instrument or is unreasonable in itself.

BEFORE NORTHROP, J., AT ABBEVILLE, SEPTEMBER TERM, 1877.

This was an action by George W. Williams & Co., wholesale grocers and cotton factors in the city of Charleston, against Vance & Moseley, retail merchants at Hodges, in Abbeville County, to foreclose a mortgage of real estate given by the defendants to the plaintiffs.

The case is as follows:

On the 29th of March, 1876, George W. Williams & Co. and Vance & Moseley entered into a covenant, in which the said George W. Williams & Co. agreed to extend the time of payment of a debt of $1,056.26 then due to them by Vance, Moseley & Co., of which firm the said Vance & Moseley had been members, and the

payment of whose debts they had assumed upon their dissolution, as well as the time of payment of a debt of $1,497.27, then due and payable to them by the said Vance & Moseley, from the 22d day of March, 1876, to the 1st day of April, 1877; to advance to the said Vance & Moseley, on their demand, the sum of $1,446.47 in cash, and to sell and deliver to them, upon their orders, groceries, at the customary prices and terms, to the amount of $1,500. The sum of $2,553.53, the aggregate of the debts of Vance, Moseley & Co. and of Vance & Moseley, was to bear interest from the 22d day of March, 1876; the sums of the cash advanced were to bear interest from the dates at which they were severally advanced, and the sums of the bills of groceries were to bear interest sixty days after the date at which they were severally advanced, all at the rate of 12 per centum per annum.

And the said Vance & Moseley, on their part, agreed in the said covenant to pay to the said Geo. W. Williams & Co., at their office in the city of Charleston, on the 1st day of April, 1877, the sum of $2,553.53, the aggregate of the aforesaid debts of Vance, Moseley & Co. and of Vance & Moseley, and the sum of $2,946.57, the aggregate of the sums of cash to be advanced and of groceries to be sold and delivered to them by the said Geo. W. Williams & Co., with interest on the said sums as aforesaid; to consign and ship to them five hundred bales of cotton, to be sold by them as cotton factors upon commissions of $2\frac{1}{2}$ per centum, and to pay as liquidated damages two dollars for each and every bale of cotton less than five hundred bales which they might fail to consign and ship to them as stipulated.

Geo. W. Williams & Co. further covenanted to pay to the said Vance & Moseley 1 per centum of the $2\frac{1}{2}$ per centum commissions and retain for themselves $1\frac{1}{2}$ per centum on sales of the cotton to be consigned and shipped to them by the said Vance & Moseley.

On the same day, in order to secure to Geo. W. Williams & Co. the faithful performance of the covenants on their part contained in the said agreement, Vance & Moseley executed to them a mortgage of certain real estate, containing a power of sale to the mortgagees and a covenant to keep the buildings on the mortgaged premises insured.

During the year 1876, Geo. W. Williams & Co. sold and delivered to Vance & Moseley, upon their orders, groceries to the amount of $756.49, and advanced to them, upon their demand, $4,252.73 in

cash, and Vance & Moseley made payments at various times to the amount of $3,112.31. There was no proof that Vance & Moseley gave direction as to the application of the payments made, or that the plaintiffs made any application otherwise than to the general account. Instead of shipping five hundred bales of cotton, as covenanted, Vance & Moseley shipped only fifty bales.

The complaint alleged that Geo. W. Williams & Co. did, during the months of March, April, May, June, September, October, November and December, 1876, advance cash and sell and deliver groceries to Vance & Moseley, as covenanted, to the amount of $5,019.62; alleged that Vance & Moseley did not consign and ship to them five hundred bales of cotton, as covenanted, but consigned and shipped to them only fifty bales, and that in consequence thereof, and in accordance with the covenants contained in said agreement, plaintiffs had sustained damages to the amount of $900; admitted that Vance & Moseley made payments to them during the year 1876 to the amount of $3,112.31.

Vance & Moseley answered the complaint, alleging that they had placed collaterals in the hands of the plaintiffs to a large amount in addition to the mortgage, and that plaintiffs had collected an amount unknown of said collaterals, and praying an accounting by plaintiffs.

The case was referred to a Referee to take the accounts between the parties and report thereon. He reported as his opinion that the two dollars per bale of cotton mentioned in the covenant were liquidated damages, and he accordingly charged Vance & Moseley with $900 as the amount of such damages. He also reported it as his opinion " that the payments should have been applied to the mortgage debt and not to excess of the advancements not secured by the mortgage," and in stating the account he so applied them.

The defendants excepted to the report, and His Honor filed the following decree on the exceptions:

On hearing the report of the Referee in this case and the observations of counsel for the plaintiffs and defendants, on motion of the counsel for the defendants, it is ordered and adjudged as follows:

1. That the credit appearing in the account exhibited with the complaint, being the proceeds of fifty two bales of cotton received and sold by the plaintiffs on account of the defendants, Vance &

Moseley, and the cash paid in May by them to plaintiffs, be applied to the items specified in the covenant of 22d day of March, 1876, and first to the debt of Vance, Moseley & Co. therein set down.

2. That the excess of advances by the plaintiffs to the defendants, Vance & Moseley, on the money item in the account exhibited be not allowed, as charged by the Referee, on the item of merchandise advanced, and that each of those items stand as stipulated in the covenant; that is to say, that the excess of advances on the items of moneys to be advanced be not charged over on the item for merchandise.

3. That the sum stipulated in the covenant to be paid by Vance & Moseley in the event of failing to forward to plaintiffs five hundred bales of cotton is, to the extent of such failure on their part, adjudged to be in the nature of a penalty to be ascertained and fixed and not as liquidated damages.

4. That the matter be recommitted to the Referee to state the account between the parties in conformity with the principles herein set forth.

The plaintiffs appealed on the following grounds:

*First.* That the presiding Judge erred in ordering the several payments made by the defendants, Vance & Moseley, in the months of May, June, November and December of the year 1876, and in the month of January of the year 1877, to be applied to the extinguishment of the debt secured by the mortgage, which debt did not become due and payable until the first day of April, 1877, instead of to the repayment of the sums of money advanced by the plaintiffs and not secured by the mortgage, which were due and payable at the times at which they were respectively advanced.

*Second.* Because the presiding Judge erred in adjudging that the sum of nine hundred dollars, being the aggregate of the sums which Vance & Moseley covenanted to pay to the plaintiffs for the failure to ship to them four hundred and fifty bales of cotton, that is to say, two dollars for each and every bale of cotton less than five hundred bales which they failed to consign and ship to them, is in the nature of a penalty and is not stipulated damages.

*Burt & Graydon,* for appellants:

Principles of law in relation to the appropriation of payments:

I. The ownership of the money determines the right of appropriation.—1 H. & W. Am. L. C., 308.

II. Where a partial payment is made by a person indebted on more than one account, he may, *at or before the time* of payment, prescribe the application of the payment, on the principle that before the money is paid it belongs to him.—*Black* vs. *Shooler,* 2 McC., 293; *McDonald* vs. *Pickett,* 2 Bail. L. R., 617; M*ayor, &c., of Alexandria* vs. *Patten,* 4 Cra., 317; *Field and others* vs. *Holland and others,* 6 Cra., 8; Smith's Mer. L., 670; 1 H. & W. Am. L. C., 291, and cases there cited.

III. If the debtor pays the money without directing any application, the money becomes absolutely the property of the creditor, and he may do with it what he will, subject only to the condition that he must apply it to some part of the debtor's liability. The right of the debtor to apply a payment passes absolutely to the creditor along with the ownership of the money and is not limited as to time; the creditor may make the application at the time of trial.

In *Schnell* vs. *Schroder,* (Bail. Eq., 342,) the Court say: "A party paying money has at the time he pays it the right to direct how it shall be applied; but if he does not direct the application, then the party receiving it may apply it to such debt of his debtor as he may choose. On what account money paid or articles delivered were paid or delivered and received is always a question of fact, and the proper answer to the inquiry is often to be collected from the circumstances attending the transaction."

In the case of *Stewart* vs. *Cochran,* (Bail. Eq., 380,) Cochran owed his factors two debts,—the one amounting to $3,367.77, secured by judgment, the other to $2,000, secured by a mortgage of slaves. In March and May, 1827, the factors sold a part of Cochran's rice crop for sums amounting in the aggregate to $2,235.40. In June of the same year Cochran executed an assignment for the benefit of all his creditors. In March, 1828, the factors sold the slaves under their mortgage, but the proceeds of the sale were insufficient to pay the mortgage debt, leaving a balance of $455.35. On a bill being filed by Stewart, the assignee, the factors contended that they were entitled to apply the proceeds of the crop of rice sold by them in the first place to the extinguishing of the mortgage debt and the residue to the judgment, and then to come in for the balance due them as judgment creditors. Stewart insisted that the factors were bound to make an application of the fund within a reasonable time, and, not having

done so previous to the assignment, they could not do it afterwards; and that, at all events, they had made their election by selling the mortgaged slaves under their mortgage,—inasmuch as the proceeds of the crop would have extinguished the mortgage debt, and, therefore, the enforcing of the mortgage was an abandonment of the right to apply the proceeds of the crop to the payment of that debt: *Held*, That as Cochran had given no direction as to the application of the proceeds of his crops, his factors had the right to apply them to whichever of their demands they deemed most advantageous to themselves; that their right could not be affected by Cochran's assignment; that the sale of the mortgaged slaves was neither a forfeiture nor an abandonment by the factors of their right to apply the proceeds of the crops as they thought proper; and that they had a right to retain the funds in their hands until they could ascertain by a sale of the mortgaged property what application would be most beneficial to them.

In the case of *Heilbron* vs. *Bissell and Warner*, (Bail. Eq., 430,) the debtor owed the creditor a judgment debt and a debt on open account, and made sundry payments without making any appropriation of them at the time he made them, nor did the creditor make any appropriation of them at that time. Upon the hearing, there was no evidence that the creditor had made any appropriation at any time of the payments; but he claimed by his answer the right to appropriate the payments to the running account; and the question before the Court was whether he could thus make the application; whether the creditor can apply payments at any time when the debtor has failed to make the appropriation at the time of payment. After a careful review of the cases, and a particular examination of the case of *Devaynes* vs. *Noble*, (1 Meriv., 570,) the Court, per Harper, Ch., decided that he had such a right, saying: "The Master of the Rolls, in the opinion I have quoted, comes to no conclusion of his own; but it seems to me that his leaning is in favor of adherence to the rule of the civil law. With the respect due to so great an authority, I have examined the cases referred to and some others on the same subject, and my conclusion is, on the preponderance of authority, that the creditor *has* that unlimited right to appropriate when the debtor has made no appropriation at the time of payment."—p. 433. After commenting further on sundry cases, the Court go on to say: "Apart from these cases, and that of *Heyward* vs. *Lomax*, (*supra*,) I have found no

authority for the Court's applying payments on a presumed intention of the debtor, nor any *dictum* recognizing the civil law rule. *Heyward* vs. *Lomax* has been often overruled, and the other cases are regarded as exceptions; and I must, therefore, conclude in favor of the defendant Joseph Warner's right to appropriate the payments in question."—p. 435. "It is, therefore, ordered and decreed * * * * that the amount of the several drafts before mentioned be credited to the running account between the defendant, Joseph Warner, and the said William P. Bason."—p. 436.

In *The Mayor of Alexandria* vs. *Patten*, (4 Cra., 320,) Marshall, C. J., says: "It is a clear principle of law, that a person owing money upon two several accounts, as upon bond and simple contract, may elect to apply his payments to which account he pleases; but if he fails to make the application, the election passes from him to the creditor. No principle is recollected which obliges the creditor to make this election immediately."

The creditor is entitled to make the application at the time of trial.—1 H. & W. Am. L. C., 296, citing 6 Taunt., 597; 2 M. & Sel., 18; 8 C. & P., 704; Gow., 74.

A debtor making a payment must direct its application at or before the time he makes it, otherwise his right to control it is gone and belongs to the creditor.—1 H. & W. Am. L. C., 293; Sm. Mer. L., 670, and cases there cited.

"The principle applied by common law is, *that the ownership of the money determines the right of appropriation.* Before the money is paid it belongs to the debtor, and he may, therefore, direct any application he pleases, and the creditor will be bound so to apply; but if he pays the money without directing the application, it becomes absolutely the property of the creditor, and, being his own, he may apply it as he pleases."—1 H. & W. Am. L. C., 308.

"A factor who has a lien on goods or other proceeds to the extent of more than their value has a right to treat them as if they were his own, subject to this single qualification, viz.: that he must apply the proceeds to some part of the debtor's liability."—*Upham and others* vs. *Lefavour*, 11 Met., 181.

"But, subject to this qualification," (*i. e.*, that when the creditor has once made the appropriation he is bound by it,) "the creditor may make the application at any time." "The later English cases show that where the creditor has not committed himself by the mode of bringing suit, or otherwise, he may direct the appropria-

tion even at the trial. Of course the application and payment must be considered as having taken place in law, before suit brought, as the right of action must be complete and fixed before the commencement of the suit, but the creditor need not in many cases do any act to declare or manifest his election till the trial."—1 H. & W. Am. L. C., 295.

"The case of *Mayor of Alexandria* vs. *Patten,* where it" [the right of the creditor to declare the application at the time of trial] "was the direct point in judgment, is itself the highest authority that there ever can be in American law, and it ought to be considered conclusive."—1 H. & W. Am. L. C., 297.

"The fine equities supposed to exist in favor of the debtor, even after he has paid unconditionally, can never countervail the gross equity which a man has to use his own property as he chooses. To allow a debtor to follow and control the application of money of which the entire ownership is in another would be inconsistent with the reason and analogies of the law."—1 H. & W. Am. L. C., 309.

The principle on which this doctrine is founded is laid down in Co. Litt., 145, *a.*

" When a thing passeth to the donee or grantee, and the donee or grantee hath election in what manner or degree he will take it, there the interest passeth presently, and the party, his heirs or executors, may make election when they will."

IV. When the appropriation passes to the law, it will apply a payment, on the principle that the ownership of the money has vested absolutely in the creditor, according to his presumed intention—that is, to the debt for which the security is most precarious.

In *Jones* vs. *Kilgore,* (2 Rich. Eq., 66,) the Court say: "There is no doubt, if no directions are given by the party making the payment, the right to make the application is with the party receiving. If neither party has fixed the application, it devolves upon the Court, and will be made, *pro rata*, to the demands held by him who receives the money against him who paid it; or if one of the demands be less secured than the others, the application will be made to it in the first instance."—Citing also 5 Mas., 82; 4 J. J. Mar., 97; 9 Cow., 420.

In the case of *Field* vs. *Holland,* (6 Cr., 8,) judgments were obtained against Cox, one of the defendants, in 1793, and in the early part of 1794, by Holland, another one of the defendants.

In December, 1794, Cox conveyed to the complainants, who, according to the allegations of their bill, were ignorant of the judgments at the time of their purchese. Executions were levied and the land sold in 1799. The other three defendants, Melton, Tigner and Smith, purchased the lands at Sheriff's sale. It appeared that at a time subsequent to the two judgments Holland made large advances to Cox and took his obligations. Cox made sundry payments, but gave no direction as to their application.

The complainants claimed that the judgments were satisfied, and that, on principles of equity, the Court should apply the payments made by Cox to the extinguishment of the judgments. Marshall, C. J., delivering the opinion of the Court, says, after disposing of some preliminary questions: "There is, then, no question on the merits but this: Were the payments properly applied by the Court, or were they applicable to the judgments? The principle that a debtor may control at will the application of his payments is not controverted. Neither is it denied that on his omitting to make the application the power devolves on the creditor. If this power be exercised by neither, it becomes the duty of the Court, and in its performance a sound discretion is to be exercised. It is contended by the plaintiffs that if the payments had been applied by neither the creditor nor the debtor, they ought to be applied in the manner most advantageous to the debtor, because it must be presumed that such was his intention. The correctness of this conclusion cannot be conceded. When a debtor fails to avail himself of the power which he possesses, in consequence of which that power devolves on the creditor, it does not appear unreasonable to suppose that he is content with the manner in which the creditor will exercise it. If neither party avails himself of his power, in consequence of which it devolves on the Court, it would seem that an equitable application should be made. It being equitable that the whole debt should be paid, it cannot be inequitable to extinguish those debts for which the security is most precarious. That course has been pursued in the present case."

"The application of a payment by a creditor is an act of the mind and a matter of intention; the entry or declaration of it by word or act is but the manifestation and evidence of it, If, after the payment, up to the moment when the appropriation passes to the law, the creditor has the exclusive right to apply, which is agreed by all, the presumption that he did appropriate it accord-

ingly is a plain conclusion of sense. The relative equities of the parties cannot vary with the different distances of time after the payment, no act to alter their rights or equities having been done by either. If it be just to delegate the application to the creditor during the period which elapses before the appropriation vests in the law, it cannot be just after that to prefer the interest of the debtor. To give the creditor the right to apply at discretion for a certain time is to adopt the principle of consulting his interests. It would be contradictory for a judicial tribunal, after the payment, first to explore and obey the creditor's intention as a matter of fact, and then to seek and follow a presumption of the debtor's intention as a matter of law. The civil law, consistently, required the creditor, in exercising his right of application, to consult the interest of the debtor. The decisions which eliminate that rule from our law seem by inevitable force of common sense to extinguish the other which requires the Court to follow the debtor's interests. In fact the rules of the civil and common law are distinct and opposed: the former empowers the debtor, in effect, to control the application of his payment indefinitely; the latter vests the appropriation of a general payment in the creditor absolutely. The true principle is believed to be that adopted in *Field* vs. *Holland*, that when the determination of the application devolves on the Court it shall be referred to that debt which is the least secured, to a simple contract debt or open account, for example, rather than to a mortgage, judgment, bond, or bond with sureties."   *   *   *   *   " But the case where one debt is secured by mortgage or judgment and the other is unsecured is that in which the equity of the creditor is least questionable."—1 H. & W. Am. L. C., 299.

For a very able and exhaustive review of this whole subject see notes to *Mayor of Alexandria* vs. *Patten* and *Field* vs. *Holland* in 1 H. & W. Am. L. C., 291.

One of the strongest instances to prove that the creditor's interest is consulted where the appropriation passes to the law is that of a bond bearing interest, in which case a payment will be applied to the interest which does not bear interest rather than to the principal which does.—*DeBruhl* vs. *Neuffer*, 1 Strob., 431.

V. Payments are applied to debts which are due and payable rather than to those which are not.

"A payment is applied rather to a debt of which the term is already come than to one that is not yet due.—*Hammersley* vs. *Knowlys*, 2 Esp. Rep., 666.

"But there is one sum of $250, received by the plaintiffs before any such payments were made, which must be applied in discharge of the sum due when the suit was brought, as they then had no other claim against the defendant upon which a suit could be maintained."—*Upham* vs. *Lefavour*, 11 Metc., 185.

"A general payment is always to be referred to a debt that is due in preference to one that is not due, because it is not to be supposed that a debtor intends to make a deposit and not a payment."—1 H. & W. Am. L. C., 292.

"But it is contended that bills for $20,000 were received, and have been applied in discharge of debts which became due two months afterwards. If the receipt given for these bills purported to receive them in payment, this objection would be conclusive. If an immediate credit was to be given for them, that credit must be given on a debt existing at the time, unless this legal operation of the credit should be changed by express agreement."—*Field* vs. *Holland*, 6 Cranch, 28, *ut supra*.

"By the express agreement of the parties, a payment may be appropriated to a debt not due."—1 H. & W. Am. L. C., 292, citing *Shaw* vs. *Pratt*, 22 Pick., 305.

VI. The question as to the appropriation of payments is one between the debtor and the creditor—no third party has any right to interfere.

In the case of *The Mayor of Alexandria* vs. *Patten*, (4 Cranch, 317,) the Supreme Court of the United States decided that a surety has no right to demand that a general payment made by his principal shall be applied to the demand on which he is surety.

In *Field* vs. *Holland*, (6 Cra., 8,) cited above, it was decided that the vendee of a judgment debtor has no right to insist that a general payment made by the judgment debtor to the creditor who has other demands against him shall be applied towards the satisfaction of the judgment.

"Thus, if one debt be the sole obligation of the debtor and the other be with a surety, guarantor or joint debtor, whether the sole debt be earlier or later in point of time than the debt with a surety, and, if earlier, whether the surety had at the time of incurring his engagement notice of it or not, the creditor may apply a general

payment made by the debtor from his own funds to the debt which is not protected, and continue to hold the surety bound,—a guarantor or surety, merely as such, being considered as having no equity to control or change an application made by the creditor."— 1 H. & W. Am. L. C., 294, and cases cited.

VII. If a creditor takes from his debtor an assignment of property out of which a certain debt is to be paid, he is bound by his contract to apply the proceeds to the payment of that debt, and cannot apply them to another without the debtor's direction so to do.

In the case of *Hunter* vs. *Wardlaw & Edwards*, (6 S. C., 74,) Hunter had given a lien on his whole crop to Wardlaw & Edwards for supplies to a specified amount, and, as a security for the performance of the covenants contained in the lien, executed a mortgage to them of certain stock. Wardlaw & Edwards advanced about sixty dollars more than the amount of the lien, and Hunter made payments to the amount of about fifteen dollars more than the lien, but gave no direction as to their application. Wardlaw & Edwards subsequently seized the mortgaged property, alleging that there was a balance due them on the lien of about forty-five dollars, sold it at auction and bought it in for a mere trifle. Hunter objected to the sale at the time, and afterwards brought suit against them for the recovery of the property. The presiding Judge charged the jury to find for the defendants, and Hunter appealed. The Court very properly held that the mortgage was satisfied, because Wardlaw & Edwards had bound themselves by contract to apply the proceeds of the crop to the extinguishment of the lien and mortgage, and they could not make any other application of them without Hunter's express permission.

" If there be only one debt incurred at the time when property is assigned out of which the creditor is to pay himself, and before the money is received another debt is contracted, the application must of course be to the former, and the creditor could not apply to the latter without an express permission to do so."—*Donally* vs. *Wilson*, 5 Leigh, 329, cited in 1 H. & W. Am. L. C., 292.

" It is a settled rule, also, that the source or fund from which a payment is made will direct the appropriation, that is, when money has come from a particular fund it must be applied by the creditor in relief of the source from which the fund arises."—1 H. & W. Am. L. C., 292.

The rules laid down in the cases of *Stewart* vs. *Cochran*, *Heilbron* vs. *Bissell & Warner*, and *Jones* vs. *Kilgore*, are the law of South Carolina, and will guide and govern this Court in the determination of this case, as these cases never have been overruled.

Principles of law deducible from the cases on the subject of liquidated damages:

1. That the intention of the parties controls the particular phraseology.

2. That the intention must be ascertained from the words used.

3. That the disproportion between the sum to be paid and the actual damage is not to be considered in the inquiry whether the parties intended it as a penalty or as liquidated damages.

4. That when the intention is not clear, the Courts incline to consider the sum a penalty, although the words "liquidated damages" are used, in cases for the performance of various things of different degrees of importance.

5. That the instrument, as well as the words, may be consulted in ascertaining the intention—as a bond, a covenant, &c.

6. That the word "penalty" and the context may control the meaning of the phrase "liquidated damages," and the latter and the context may control the word "penalty."

7. That the phrase "liquidated damages" has a meaning as definite and precise as the word "penalty."

8. That the early English and American cases have been modified by recent decisions.

9. That a sum agreed to be paid for the doing or not doing of a particular act, within the power of the party, is always liquidated damages or an alternative agreement.

The stipulation on the part of Vance & Moseley is, within a specified time, to consign and ship to appellants five hundred bales of cotton, to be sold by them as cotton factors on commissions, and to pay as liquidated damages two dollars for each and every bale less than that number which they might fail to ship.

Is this a covenant to pay as liquidated damages the two dollars for each bale not shipped, or is the two dollars a bale a penalty?

In *Orr* vs. *Churchill*, (1 H. Black., 232,) Lord Loughborough said: "There can only be an agreement for liquidated damages where there is an agreement for the *performance of certain acts*, the not doing of which would be injurious to one of the parties, or to guard *against the performance of acts* which, if done, would also be injurious."

In *Astley* vs. *Weldon*, (2 Bos. & Pul., 357,) Ashurst, J., said "When it is agreed that if a party do such a particular thing such a sum shall be paid by him, the sum stated may be treated as liquidated damages."

In *Bearden* vs. *Smith*, (11 Rich., 550,) the Court said : "The distinction between a penalty and liquidated damages is, that the one is a surety for and the other to be paid in lieu of the act to be done."

All the cases declare that where the intention of the parties is clearly manifested that intention must prevail.

" The intention of the parties is to be ascertained from the words used. That which the words declare is the intention, and neither Legislatures nor Courts have a right to add to or to take away from that meaning."—New York Court of Appeals, *Newell* vs. *The People*, 3 Seld., 97.

"Our office is to ascertain the intent of the parties, and, if not contrary to law, to carry their intention into execution."—Chief Justice Best, *Crisdee* vs. *Bolton*, 3 C. & P., 240.

In that case Chief Justice Best said: "A Court has no more authority to put a different construction on the part of an instrument ascertaining the damages than it has to decide contrary to any other of its clauses."

The words "stipulated damages" have a technical or ascertained meaning, as has the word " penalty."

In *Reiley* vs. *Jones*, (1 Burr., 302,) Parke, J., in giving judgment, referred to the case of *Astley* vs. *Weldon*, and laid stress on the fact that the words "liquidated damages" had not been used in that case.

In *Bearden* vs. *Smith*, the Court of Appeals laid stress on the absence of those words.

In that case the Court said that not only the words used, but the instrument itself, may be referred to as showing the meaning.— *Astley* vs. *Weldon*, 2 Bos. & Pul., 346.

Either phrase, penalty or liquidated damages, may be controlled by some other strong consideration ; neither, therefore, is absolutely conclusive.— *Crisdee* vs. *Bolton*, 3 C. & P., 240 ; Sedg. on Dam., 401.

As each phrase is subordinate to the intention, and may be controlled by the force of other words, or affected by the character of the instrument, let us see whether such words are in this instrument.

It is a covenant, not a bond. The words are plain and express a definite thought.

There are no words to qualify or control the force of the phrase "liquidated damages."

"When the words are clear and explicit the extravagance of the sum cannot be considered."—N. Y. Sup. Court, *Baglay* vs. *Peddie*, 5 Sandf., 192.

In *Taylor* vs. *Sandiford*, (7 Wheat., 13,) Marshall, C. J., said "it would require very strong evidence for this Court to say that the words of the parties do not express their intention."—See also *Astley* vs. *Weldon*, 2 B. & P., 357.

In *Dakin* vs. *Williams*, (17 Wend., 447,) the Court says it has no dispensary power; cannot inquire whether the parties acted wisely or foolishly; parties may give away their property and the Court cannot interfere.—13 Wend., 587.

In *Bearden* vs. *Smith,* the Court said : "When the intention is clear, the disproportion of the sum to the actual damages cannot be considered."

If the phrase "liquidated damages" has a meaning, and the disproportion between the sum agreed on by the parties and the actual damage cannot control that meaning, the cases disclose but one consideration that will control it.

In *Astley* vs. *Weldon* the rule is laid down that "when the agreement contains several distinct covenants on which there may be divers breaches, some of an uncertain nature and others certain, with one entire sum to be paid on breach of performance, the contract will be treated as a penalty."

This rule was approved in *Smith* vs. *Smith*, (4 Wend., 468,) in which a bond was given in the penalty of $10,000 not to practice as a physician, and, if the obligor did, that he should pay $500 for every month that he so practiced—the $10,000 held a penalty, but the $500 liquidated damages.

But in *Slosson* vs. *Beadle*, (7 Wheat., 72,) Bronson, J., said: "This does not belong to the class of cases in which the question of liquidated damages has actually arisen. It will be found in most, if not all, of those cases that there was an absolute agreement to do or not to do a particular act, followed by a stipulation in relation to the amount of damages in case of a breach."

The examples of this rule are numerous and uniform.

In *Crisdee* vs. *Bolton*, £500 were agreed to be a penalty, to be paid as liquidated damages if defendant should set up a victualing house in one mile of that sold to plaintiff: *Held* liquidated damages.—See, also *Barton* vs. *Glover*, Holt, N. P. Ca., 203; *Pierce* vs. *Fuller*, 8 Mass., 223; *Mott* vs. *Mott*, 11 Barb., 127; *Reynolds* vs. *Bridge*, 5 Ellis & B., 528.

In *Love* vs. *Peers*, (4 Burr., 2225,) Lord Mansfield remarked on covenants in general and covenants secured by a penalty or forfeiture, and said in the latter case the party may recover the penalty ; that the penalty is the particular sum liquidated by the parties, and is, therefore, the proper amount of damages.

In *Fletcher* vs. *Dyche*, (2 T. R., 37,) a bond was given in a penalty of £200, conditioned for finishing certain iron work by a specified day, and to forfeit and pay £10 for every week after that time until it was finished : *Held* liquidated damages.

In *Hurst* vs. *Hurst*, (4 Excheq., 571,) in an action on covenant not to top trees under a given penalty for each tree: *Held* liquidated damages.

In *Slosson* vs. *Beadle*, (*supra*,) the agreement was that in consideration of $500 paid for fifty acres of land the defendant would convey the land in one year, or in lieu thereof pay $800 : *Held* liquidated damages.

In *Hasbrook* vs. *Tappen*, (17 John., 200,) the agreement was for the conveyance of certain lands at a fixed time, the price to be paid on the delivery of the deed, and the parties bound themselves in case of failure to pay the one to the other $500 as liquidated damages: *Held*, too clear for question, that it was a case of liquidated damages.

In *Knapp* vs. *Maltby*, (13 Wend., 587,) the covenant was to assign a lease and give possession, and for failure of either of the covenants to forfeit $500 as the liquidated damages: *Held* as " clear a case of liquidated damages if the parties have power to liquidate them."

In *Dakin* vs. *Williams*, (17 Wend., 447, 22 Wend., 201,) defendants sold to plaintiff a newspaper in Utica for $3,000, with subscription, good will and patronage of the paper, and defendants agreed not to establish a paper in Utica, nor suffer one in any of their buildings, nor aid or assist in establishing one, and bound themselves in $3,000 for the performance of each and every part of the covenant, and that the sum of $3,000 was fixed and settled as liquidated damages, and not as a penalty, for violation of the cove-

nant in any of its terms or conditions: *Held* liquidated damages. In this case all the cases were reviewed, and the principle is maintained that the parties have the same right to make a contract fixing the amount of damages as to make any other contract.

In *Pearson* vs. *Williams,* (26 Wend., 630,) a purchaser of lots engaged to erect on the lots two brick buildings by a certain day or to pay on demand $4,000: *Held* liquidated damages.

The cases of *Astley* vs. *Weldon* and *Kemble* vs. *Farren* (6 Bing., 141,) have been reviewed and the principle qualified.

In *Atkinson* vs. *Kinnier,* (4 Excheq., 776,) Parke, J., said *Kemble* vs. *Farren* was "somewhat stretched," and if a party agrees to pay a sum for the non-performance of a contract, consisting of one or more stipulations, the breach of which cannot be measured, then stipulated damages, and not a penalty, must be taken to have been meant.

*Price* vs. *Green* (13 M. & W., 700,) was an agreement not to do business as a perfumer in the cities of London and Westminster, and defendant bound himself in the sum of $3,000, to be paid as liquidated damages and not as a penalty: *Held* liquidated damages.

There are but five cases on the subject in this State, and they do not furnish a principle upon which they can be reconciled with each other or with the English and New York cases.

*Law* vs. *House* (3 Hill, 270,) was a covenant by which the parties bound themselves in the sum of $2,000 to execute an agreement by which plaintiff was to convey to defendant a tract of land and defendant to pay for it $5,000: *Held* a penalty.

*Owens* vs. *Hodges* (1 McM., 114,) was a bond in a penalty to abide an award: *Held* a penalty.

*Bearden* vs. *Smith* (11 Rich., 554,) was an agreement without seal to forfeit $100 if defendant failed to put plaintiff in possession of a house and lot: *Held* a penalty.

*Allen* vs. *Brazier & Randolph* (2 Bail., 293,) was an agreement to deliver a slave to plaintiff on a certain day or pay $100: *Held* liquidated damages.

In *Worrell* vs. *McClinaghan* (5 Strob., 115,) the agreement was that a building should be finished by a particular day, and $100 a month be deducted from the price after that day until finished: *Held,* That the sum of $100 per month agreed to be paid by defendant was liquidated damages, and that the jury should have been so charged as matter of law.

In none of the South Carolina cases was the phrase "liquidated damages" employed, and yet in two of them the sum stipulated to be paid was held liquidated damages and not a penalty.

A review of the English and New York cases that have been cited shows that the only consideration which takes from the phrase "liquidated damages" its force is that a number of things of different degrees of importance was agreed to be done, and, consequently, the damages for each one could not have been intended to be the sum agreed upon by the parties.

The later case of *Esmond* vs. *Benschoten* (12 Barb., 366,) seems to repudiate that exception. The covenant in that case was to convey land and to deliver a lot of hay, some apple trees and part of a growing crop of grain, and the other party covenanted to pay a sum of money and to execute a bond of indemnity against two mortgages, and if either party failed to perform to pay the other $500 as "liquidated damages": *Held* liquidated damages.

The recent English and New York cases, and especially the latter, appear to have modified the earlier cases and to have given to the phrase "liquidated damages" its usual and proper signification, and more fully to recognize the right of parties to make their own contracts, as will appear from the following cases:

In *Farnham* vs. *Ross* (2 Hall, 167,) the covenant was to finish a building by a certain day, under a "penalty of $30 a day for every day thereafter that it should remain unfinished, to be paid as liquidated damages": *Held* liquidated damages.

To the same point are *Holmes* vs. *Holmes*, 11 Barb., 137 ; *Munday* vs. *Culver*, 18 Barb., 336 ; *Norman* vs. *True*, 19 Barb., 106 ; *Baglay* vs. *Peddie*, 24 Barb., 375 ; *Dunlap* vs. *Gregorie*, 6 Seld., 245.

In *Crisdee* vs. *Bolton* (3 C. & P., *supra*,) Chief Justice Best said : "The law in relation to liquidated damages has always been in a state of great uncertainty. This has been occasioned by Judges endeavoring to make for parties a better contract than they have made for themselves."

Parties have a right to make any contract which does not contravene the law and the Courts are bound to enforce it. They have a right to agree as to the amount of damages after a contract has been violated without resort to the Courts, and they may agree in advance as to the amount of damages to be recovered on such breach.

In the Roman law parties are advised in contracts for doing any thing to fix the amount of damages by a precise stipulation in the contract.—Sedgw. on Dam., 398.

This is an alternative obligation and the sum stated cannot be termed a penalty.

Sedgwick (p. 405) defines an alternative agreement to be an agreement to pay a certain sum on a contingency, which is dependent on the choice of the party himself, and considers *Hurst* vs. *Hurst* an example of such agreements.

For a full discussion of the subject of liquidated damages, see Sedgwick on Damages, page 395.

*Cothran,* contra:

"*Actus legis nemini est damnosus.*"—2 Inst., 287.

It has been agreed that "there was no proof that defendants, Vance & Moseley, gave directions as to the application of the payments made or that the plaintiffs made any application, otherwise than as appears, to the general account stated." And the appellants now claim that the application of these credits should be made, by operation of law, to the outstanding items—that is to say, to those items of the account not covered by the mortgage. And this by act or operation of law! The law prejudices no man. It is indeed asking much of the Court to do that which if Vance & Moseley themselves had directed would have made them liable to be adjudged involuntary bankrupts.

The second ground of appeal involves the question of difference between that which is a penalty and stipulated damages.

It would be difficult, perhaps, to find a more fruitful cause of litigation, and it is not an extravagant assertion to say that the books are full of decisions upon this subject.

It is, however, safe and well to premise "that the Courts have generally shown an inclination to treat a sum so reserved rather as a penalty than as liquidated damages."—Chit. Con., 764, foot note 2, where the cases are collected.

II. A careful review of nearly all of these cases has induced the following conclusion: Whenever the damages provided against are in their nature uncertain in amount, impossible of ascertainment, or capable of being ascertained only at great expense and difficulty, "it is neither illegal nor unreasonable" in the parties, by their mutual agreement, to settle the amount of damages uncer-

tain in their nature, incapable of ascertainment or only possible of ascertainment by great trouble and expense; and, upon the other hand, wherever the breaches provided against are susceptible of easy and accurate valuation, the Courts have invariably construed the breach of the covenants to be a penalty and not liquidated damages.

III. All the cases are divisible into two general classes as follows: Liquidated damages are recoverable when agreed upon by the parties for breach of the following and like covenants:

1. Upon the dissolution of a copartnership at law, the outgoing partner covenanted not to interfere with the clients of the late firm, or carry on the business of an attorney within fifty miles of a place named, nor in any respect infringe that covenant. Breach held to entitle plaintiff to recover whole amount stipulated.—*Galsworthy* vs. *Strutt*, 1 Excheq., 659.

2. Where the good will and material of a newspaper were sold for $3,500, valuing the material at $500 and the good will at $3,000, and the vendor covenanted with the vendee in the sum of $3,000 not to publish another newspaper in the same town for the space of seven years, upon breach of the covenant, *held* that the whole amount stipulated was recoverable as liquidated damages.—*Dakin* vs. *Williams*, 17 Wend., 447 ; *Williams, survivor*, vs. *Dakin & B.*, 2 Wend., 201.

3. Where a builder stipulates for the completion of a dwelling house in a given time, and in default covenanted to deduct $100 per month until completion, upon breach of the covenant, builder held liable for the $100 per month as liquidated damages, and this upon the ground that owner of house was subjected to much inconvenience for want of the house, annoyed by the presence of the workmen, &c., the equivalent of which, in money, was incapable of being ascertained by proof.—*Worrell* vs. *McClinaghan*, 5 Strob., 116.

Other examples might be cited as to liquidated damages, but these and such as these will be found, upon careful observation, to include all that can be referred to this class.

As to cases of penalty, as contradistinguished from liquidated damages :

It may be as well to dispose, *in limine*, of the expression contained in the covenant " *to pay as liquidated damages.*"

In *Kemble* vs. *Farren*, (6 Bing., 141,) the plaintiff agreed to pay to defendent £3 8s. and 6d. per night for performing in his theatre

for four seasons, and the agreement contained a stipulation for the payment of £1,000 if either party should neglect or fail to fulfill the agreement, and the said sum was declared by the parties to be *liquidated damages and not a penalty.* Breach that defendant refused to act during the second season, and plaintiff claimed £1,000. Verdict for plaintiff £750, subject to a motion to increase the verdict to £1,000 if the Court should adjudge it to be a case of liquidated damages. ·The verdict held to be correct. The Chief Justice, in delivering the opinion of the Court, said: " It is difficult to suppose any words more precise or explicit than those used in the agreement; the same declaring, not only affirmatively that the sum of £1,000 should be taken as liquidated damages, but negatively also that it should not be considered as a penalty or in the nature thereof."

And to like effect is *Astley* vs. *Weldon*, 2 B. & P., 851.

Suppose the defendants had shipped five hundred bales of cotton as stipulated, valued at the average price of those that were shipped, say $45.30 per bale, the plaintiffs' commissions at 2½ per cent., less the return commissions of 1 per cent., would have amounted to $305.77 instead of $900, as claimed by them; that is to say, for the labor and trouble, care and diligence of handling four hundred and fifty bales of cotton the plaintiffs would have received $305.77, whilst, on the other hand, without labor, trouble, care or diligence, they claim the right to receive $900.

Can it be concluded otherwise than in the language of the Chief Justice in *Kemble* vs. *Farren*, (*supra*,) that this is precisely the case "in which Courts of equity have always relieved, and against which Courts of law have, in modern times, endeavored to relieve by directing juries to assess the real damages sustained by the breach of the agreement?"

Sustaining this exposition of the law may be found the more recent cases of *Galsworthy* vs. *Strutt*, (*supra*); *Price* vs. *Green*, 16 M. & W., 346; *Homer* vs. *Flintoff*, 9 M. & W., 678; *Beckham* vs. *Drake*, 8 M. & W., 846; *Boyce* vs. *Ancell*, Scott, 364.

VI. What is the difference between this case and a common money bond, with a penalty, where the obligor binds himself to pay twice the number of dollars stipulated in the condition?

Does not the old form of "judgment final" entitle the obligee to recover only the condition of the bond with the accrued interest as the measure of actual damages?

Wherefore, in this case, would it not be safe and just to conclude that, the damages complained of being easy of ascertainment, that that which can be made certain is to be regarded as certain? that the plaintiffs are entitled to recover no more than the actual damages sustained? That this is not to be likened to the cases to be found in the books allowing liquidated damages, first, of the removal of the lime kiln, which was a nuisance; second, nor to the turning up of meadow lands, which was a matter of fancy; third, nor to the cutting down of forest trees which injured a pleasant prospect; fourth, nor to the inconvenience of not being let into the building and the disagreeable presence of the workmen; fifth, nor to the establishment of a rival business, the injury resulting from which could not be shown except by troublesome and expensive investigation, if at all, but, upon the other hand, is a matter susceptible of easy and exact proof, and is, therefore, a case of penalty, according to all of the authorities, and not one of liquidated damages?

VII. Judge Cowen, the author of the reports which bear his name, in the case of *Spencer* vs. *Tilden*, (5 Cowen, 150,) in a note to that case, says:

"This doctrine, which converts damages apparently stipulated or fixed by the parties into a penalty came from the civil law, through the Court of Chancery, and has at length obtained a firm hold in the Courts of common law. It is obvious that, in order to enforce it, Courts must disregard the particular expressions of the parties; for the moment we agree that a party may, by calling a real penalty liquidated damages, or throwing it in the form of an alternative in a contract, or substituting its payment for some specified default, secure the whole to himself, without regard to the real damages, we bring back the oppressive rule of the common law. The griping creditor will always use the particular form or phraseology of contract which will secure him his pound of flesh, unless the Courts interfere in all cases and tell him that, from the very nature and essence of his bond, whatever he claims, and in whatever shape or upon whatever footing, if it be in truth plainly beyond the legal amount of damages, so far it shall be no more than nominal."

Hence he concludes that the rule laid down by Mr. Holt, in his note to *Barton* vs. *Glover*, (Holt's N. P. Rep., 43,) is the true one, viz.: "Where a sum of money, whether in the name of a penalty

or otherwise, is introduced in a covenant or agreement merely to secure the enjoyment of a collateral object, the enjoyment of the object is considered as the principal intent of the deed or contract, and the penalty only as accessory, and, therefore, only to secure the damages really incurred."

The true and only consideration of the stipulation touching the 500 bales of cotton is the amount of damages which the plaintiffs have sustained by the failure of the defendants to ship the cotton.

The misfortunes of the debtors, who have failed, are not to be regarded as crimes deserving of punishment as in the Court of Sessions. They failed to comply with their contract from causes which were beyond their control. The extent of that failure and its causes are well known, and the damages actually sustained by these plaintiffs are susceptible of easy and exact ascertainment, and to that amount the recovery on the breach of the covenant should be limited.

*McGowan & Parker*, same side:

1. So far as executed, the parties must be presumed to act with reference to all the stipulations of the covenant. The largest part of the credits was from proceeds of cotton shipped in accordance with the stipulations of covenant, and Vance & Moseley must be presumed to have shipped the cotton with reference to the sums of indebtedness secured by the covenant and mortgage.

It would be monstrous injustice to permit Geo. W. Williams & Co. to claim damages for non-fulfillment of one clause of the covenant, and at the same time to apply the cotton shipped in partial fulfillment of same clause to the payment of indebtedness not secured by the same covenant.

In the absence of any proof as to application by debtor or appropriation by creditor with his knowledge or acquiescence, and without notice of such appropriation, the law will apply the payment according to the intention of party as ascertained from the circumstances of the case.

" But if at the time the debtor makes the payment he declares that it is specifically made in discharge or in part liquidation of a particular account, or if the circumstances show that such was his intention, the creditor is bound thereby and he cannot apply it to any other demands."—Chit. Con., 761, marg. p. 650; *Newmarsh* vs.

*Teal_ly*, East., 239; *Peters* vs. *Anderson*, 5 Taunt., 596; *Shaw* vs. *Picton*, 4 B. & C., 715; *Reed* vs. *Boardman*, 20 Pick., 442; *Hall* vs. *Martin*, 17 Mass., 575; *Bonaffe* vs. *Woodbury*, 12 Pick., 463; *Berian* vs. *Mayor of New York*, 4 Rob., 558.

2. But as to payments made in May and June, 1876, of $893.32, no other application can be made than to the payment of the debt of V., M. & Co., (the oldest,) or the debt of V. & M., or advances made up to that date. At that time these were the only sums due to plaintiffs by V. & M., (and it is immaterial to which applied,) and payments must be so appropriated.

A debtor may pay a debt not due, if we admit these sums not to be due. The recitals of the covenant showed that V. & M. were embarrassed; that they needed cash and goods to enable them to carry on their business.

Their intention must govern, and it cannot be supposed that they intended that sum to remain unapplied in the hands of G. W. W. & Co. until April, 1877. "If neither party makes any specific application of money paid at the time of payment, the law applies it to the oldest claim then held by the party receiving against the party paying; and if there is but one such claim then *existing* or due, it must apply to that."—*Shipway* vs. *Bowery National Bank, New York*, 36 N. Y., 501.

To oldest debts, when several.—*Mulliken* vs. *Tafts*, 31 Maine, 497; *Caldwell* vs. *Wentworth*, 14 N. Hamp., 431; also, *Walter* vs. *Richardson*, 11 Rich., 466. .

Second. But this was *one entire and running account* and not *two distinct* accounts as claimed.

1. This is evidenced by the plaintiffs submitting it as such to defendants, V. & M., on 12th February, 1877, and setting it forth with their account current exhibited as a "bill of particulars" with their complaint.

2. By their making no stop or rest in the account after they had advanced in full the sums covenanted.

3. By their blending together and intermingling the various sums of cash advanced, over and beyond the several sums covenanted, with the items of bills for merchandise sold and delivered under the covenant. To make the mortgage debt and the subsequent advances two *distinct debts*, it will be necessary to separate the bills for merchandise from the subsequent unsecured advances and rearrange the whole so as to make two accounts. This cannot now

be done, even if it could have been done before suit. Plaintiffs evidently did not so regard it. It was an *after* thought, and emanated from the ingenuity and legal acumen of counsel.

4. Because in order to make two *separate* accounts, it will be necessary to divide one item, to wit: The advance on 19th April, 1876, to J. A. Birch, carter, of $163.60, so as to apportion $135.58 to the mortgage debt and $28.02 to the account for subsequent advances, this sum, $163.60, being in excess of the cash covenanted to be advanced by the latter sum, viz., $28.02. This plaintiff did not and cannot now do.

"*Prima facie* the doctrine as to the appropriation of payments does not apply where there are not *distinct* accounts, or where separate accounts are treated as one *entire* account by all parties. In such cases, therefore, payments made generally are presumed to have been made in discharge of the earlier items of the account, although at the time of payment the debtor was silent on the subject."—Chit. Con., 766, marg. p. 654; *United States* vs. *Kirkpatrick*, 9 Wheat., 720; *Postmaster General* vs. *Furber*, 4 Mason, 336 ; *Baker* vs. *Stackpole*, 9 Cowen, 435 : *Pemberton* vs. *Oaks*, 4 Russell, 154 ; *Clayton's* case, 1 Meriv., 572; *Bodenham* vs. *Purchase*, 2 Barn. & Ald.. 39; *Williams* vs. *Rawlinson*, 3 Bing., 77 ; *Upham and others* vs. *La Farvfour*, 11 Metc., 174; *Webb* vs. *Dickinson*, 11 Wend., 62 ; *Seymour* vs. *Vandyck*, 8 Wend., 418; *Trescott* vs. *King*, 2 Selden, 147 ; *Shepherd* vs. *Steed*, 43 N. Y., (Hand 4,) 52; *Coleman* vs. *Lansing*, 65 Barb., 54 ; *Smith* vs. *Wigley*, 3 M. & Scott, 174 ; *Steindale* vs. *Hawkinson*, 1 Sim., 393.

4. But the items of advances beyond covenant were not separate and distinct accounts or debts upon which the plaintiff could have sued separately, and, therefore, the payments should not, as claimed by their counsel, be applied to these accounts as due in preference to the other demands under the covenant.— *Walter* vs. *Richardson*, Rich. L., 466.

5. But, supposing them to be *two separate* accounts, (or many, if each item constitutes a separate debt, as claimed by the plaintiffs' counsel,) the payments must be applied to the mortgage debt. "If a debt is due on mortgage and open account and partial payments are made by the debtor without any application, the law will apply the payment to the mortgage debt."—*Dorsey* vs. *Garmany*, 2 Har. & J., 402 ; *Pattison* vs *Hull*, 9 Cowen, 747 ; *Deverynes* vs. *Noble*, 1 Meriv., 570; *Trescott* vs. *King*, 2 Selden, 147 ; *Dows* vs.

*Moorewood,* 10 Bar., 183; *Allen* vs. *Culver,* 3 Denio, 284; *Cassen* vs. *Alders and Trustees,* 5 Metc., 268; *Wardlaw & Edwards* vs. *Hunter,* 6 S. C., 74; *Lawton* vs. *Maner,* 10 Rich., 323.

The following cases in S. C. Reports examined and found not to conflict: *Heilbrun* vs. *Bissell & Warren,* Bail. Eq., 430; *Stewart* vs. *Cochran and others,* Bail. Eq., 380; *Ordinary* vs. *McCollough,* 3 Strob., 494; *Adams* vs. *Krimager,* 1 McM., 309; *Carson* vs. *Hill & Jones,* 1 McM., 76; *Smith* ads. *Scriven,* 1 McC., 368, top p. 230; *Jones* vs. *Kilgore,* 2 Rich. Eq., 62; *Gowan* vs. *Tunno,* Rich. Ch. C., 369; *McDonald* vs. *Pickett,* 2 Bail., 617; *Schnell* vs. *Schroeder,* Bail. Eq., 328; *Black* vs. *Schroeder,* 2 McC., 293.

*Second.* As to "liquidated damages."—Chit. Con., Chap. VI, p. 763; *Shoot* vs. *Taylor,* 5 Metc., 61; *Spencer* vs. *Tilden,* 5 Cowen, 150; *Worrell* vs. *McClenaghan,* 5 Strob., 116.

The excessive amount claimed as "damages," though denominated "liquidated," show that the parties themselves regarded it as a penalty. The "damages" sustained by Geo. W. Williams & Co. by the failure of Vance & Moseley to ship 450 bales was the loss of commissions on the sales of the cotton. Commissions are charged for services rendered in selling, collecting proceeds and remitting.

March 21, 1878. The opinion of the Court was delivered by

WILLARD, C. J. The solution of the various points of objection raised by the appeal depends on the construction of the contract set forth in the complaint. The transactions covered by the contract were those of merchants dealing together, in the course of their business, to promote business objects, and when it becomes necessary to clear up any doubt arising on the face of the instrument resort may be had to the nature of the business transactions by the respective parties so far as it enters into the contract, in order to define its motives and objects, and thus to lay hold of the key of construction.

The plaintiffs appear in the transaction as merchants residing and doing business in Charleston, selling merchandise, making advances on cotton shipped to them for sale and making sales of cotton upon commission. The defendants, Vance & Moseley, appear as merchants in the interior of the State, purchasing goods in Charleston for resale, and shipping cotton for sale through that city, taking cash advances on consignments of cotton for sale.

The leading objects of the contract on the part of the plaintiffs appear to be, first, to obtain security, by way of mortgage, for a *past* debt due by V. & M. individually and another assumed by V. & M., but originally due from Vance, Moseley & Co., upon an extension of time for the payment of such debts; second, to obtain security, by way of mortgage, for future sales of merchandise to V. & M., on time, to a limited amount; third, to procure consign- ments of cotton from V. & M., to be sold on commission, they making cash advances, secured in part by mortgage. The last named object was secured by stipulations on the part of V. & M. to ship a certain quantity of cotton, the plaintiffs agreeing as to the amount of the commissions to be charged for its sale, and also V. & M. agreeing, in the event of their failure to ship the required amount of cotton, to pay for such default a stipulated sum per bale as liquidated damages for such failure.

The objects of the contract on the part of V. & M. appear to have been to get time on account of their debt and that due on account of V., M. & Co.; second, to get a credit for merchandise to a limited amount; third, to obtain cash advances for a fixed amount and fixed time; and, further, to secure reduced commissions on sale of their cotton consigned to plaintiffs.

We have only to consider those features of the contract that pro- vide a mortgage security for goods sold and cash advanced and those that relate to the mode of dealing with consignments of cot- ton, including the liquidated damages for failure of shipment, there being no question before us as affecting that part of the contract that provides for the payment of past debts. The contract, then, as it stands before us for construction, relates to future mercantile transactions between the parties.

Plaintiffs were bound to sell merchandise to a limited amount and upon certain conditions as to length of credit and interest on sales. They were also bound to make cash advances to a certain limited amount, for which they would hold the mortgage security. These secured cash advances would not be sufficient to cover the whole of the cotton agreed to be shipped, but it is to be presumed that both parties anticipated that, as the consignments of cotton went forward, the plaintiffs would make the customary advances on consignments, independently of the limit of the contract, holding, as the plaintiffs would in that case, the mortgage as security to the extent of the contract and the cotton as to any excess. The natural

results of this course of dealing would be that the plaintiffs would not be at liberty to retain the proceeds of cotton sold for the account of V. & M. to any greater extent than would be necessary to keep the indebtedness of V. & M. within the limit agreed for cash advanced; the balance in their hands derived from consigned cotton, less commissions and expenses, the defendants, V. & M., would be entitled to receive in the ordinary course of business. In other words, the plaintiffs' situation, as it regards the proceeds of cotton sold for the account of V. & M., would differ from that of ordinary consignments or commissions only in the respect that they would not be able to retain such proceeds to the full amount of current advances on the cotton, but only to the extent necessary to keep their cash advances within the limit of the contract. Thus plaintiffs would hold the mortgage as agreed security for advances up to the limit agreed upon and until that limit should be passed; as they realized proceeds of the sale of consigned cotton they would be required to hold such proceeds, less commissions and expenses, subject to the draft of the defendants, V. & M. This is the conclusion that would arise from considering the general objects of the contract; and the question arises whether it consists with the terms of the contract.

Before looking to the specific terms of contract, it will be convenient to refer to the views of the defendants as to its true construction.

They say, in the first place, that the plaintiffs agreed to advance cash to a prescribed amount, and to sell merchandise to a fixed amount; that, in point of fact, they advanced more money and sold less goods than the contract called for, and that the mortgage only stands for the security for cash advanced to the fixed amount, the excess of cash advances being unsecured, and that the plaintiffs cannot gain an advantage in this respect from the fact that the amount of goods sold was less than the contract called for, and that the difference should not be added to the amount of cash agreed to be advanced, giving security beyond the limited amount. The next point made by the defendants is that all moneys of the defendants, V. & M., that came into plaintiffs' hands should have at once been credited as against the cash advances called for by the contract, so as to extinguish such cash advances and discharge the mortgage as it regarded them,—the result of which view would be that V. & M., instead of having a standing credit for a year, in addition to that

arising from the value of the merchandise consigned, thus securing
them valuable facilities for the transaction of their business, would
be in the position to have that cash credit wiped out by the first
receipts on sales of cotton, and after that would have no means of
credit beyond the value of the cotton consigned.  It is hardly to be
supposed that V. & M. would have advanced this proposition while
the contract giving them a cash credit was outstanding.

The next point of objection is that the provisions stipulating as
to liquidated damages import a penalty merely, and that recovery
can only be measured by damage proved.

We will examine these propositions in the order stated.  It is
clear that the covenant of V. & M. covered by the mortgage secu-
rity looks solely to the aggregate of cash advanced and merchan-
dise sold, as it regards the amount agreed to be paid, and not to the
relative amount of cash.  Plaintiffs covenanted "to advance to said
Vance & Moseley, on their demand, the sum of $1,446.47 in cash,
and to sell and deliver to them, upon their orders, groceries at the
customary prices and terms, to the amount of $1,500."  V. & M.,
on their part, agreed to pay plaintiffs the "sum of $2,946.57, the
aggregate of the sums of cash to be advanced and groceries, to be
sold and delivered to them" by the plaintiffs.  The covenant of
V. & M., standing by itself, imports an obligation based on such
advances of cash and sales of merchandise as should thereafter be
made, not to exceed the prescribed amount.  It would seem thus to
support the conclusion that if V. & M. saw fit to diminish the
quantity of goods purchased and to increase the amount of cash
borrowed, they would be liable for the aggregate sum, provided it
did not exceed the prescribed amount.  This covenant must be read
with those of the plaintiffs most nearly related as consideration to it
and the proper sense derived from both taken together.  Plaintiffs'
agreement imposed a limit to cash transaction separately.  The
benefit of this limit was intended for the plaintiffs.  The defendants,
V. & M., wanted credit, and accordingly that construction of their
covenant which afforded the largest and the most flexible credit
would be the object they would naturally pursue.  It was evidently
most favorable for V. & M. that in case they did not need groceries
to the amount stipulated their cash credit might receive a corres-
ponding benefit.  It may be assumed that the interest of the
plaintiffs was to sell goods and not to lend money.  The event

showed that V. & M. were more concerned to borrow money than buy goods. There was nothing in the contract to prevent the plaintiffs at any time from waiving the limit of cash advanced in favor of a request from V. & M., and such a concession to V. & M. could not with propriety operate to defeat their covenant when clearly covered by its language.

There is no ground to narrow the terms of the covenant of V. & M., as it stands expressed, by any inference drawn from the terms of the covenant on the part of plaintiffs, and it must be enforced as it stands. The result of this conclusion is that the amount of cash advanced and groceries sold, not exceeding the sum of $2,946.57, with interest added, as prescribed by the contract, is properly chargeable as secured by the mortgage. The judgment below is, therefore, erroneous in this respect.

The next proposition relates to the mode in which cash advances and net proceeds on the sales of consigned cotton should be charged. The covenant of V. & M. was to pay the sums of cash advanced and groceries sold on the first day of April, 1877. It follows that payment of such amounts could not be demanded until that time, and it follows, also, that sums of money coming into the hands of the plaintiffs for the account of V. & M. over and above any amount in which V. & M. might be indebted on other account than that to which the contract related are to be considered as held subject to the draft of V. & M., the plaintiffs having no right to make any other appropriation of them whatever. It is not to be assumed that the parties intended that the whole yearly transactions of V. & M. with plaintiffs as it regards cotton should be tied up in the hands of the plaintiffs as security for debts due, groceries sold and cash advanced when otherwise fully secured. On the contrary, the very object of the mortgage must have been to render V. & M. free to transact their business in the most favorable method during the life of the credit given by the contract. Such is the clear reason and sense of the contract, and, while the transaction was current between the parties, they seem to have acted upon it. Now that V. & M. have reaped the benefit of the contract, they cannot properly deny such construction, patent on the face of the contract and carried out in the practical operation under it. It follows that the report of the Referee and the decree upon it are erroneous in charging the sums of cash advanced and amounts realized from

consigned cotton against the amount secured by way of mortgage. On the contrary, the account should be made up by striking a balance between current debits and credits for cash and groceries and charging such balance, if it does not exceed the amount stipulated by the contract, namely, $2,946.57, with accumulations of interest, computed according to the contract, and that sum, added to the aggregate debts of V. & M. and V., M. & Co., with interest according to the contract, must be decreed as due under the mortgage.

The next question arises on the language of the contract immediately following the agreement to consign 500 bales of cotton, which is as follows: "And to pay as liquidated damages two dollars for each and every bale of cotton less than 500 bales which they might fail to consign and ship to them as stipulated."

The right of parties to a contract to fix the amount of damages, in their nature unliquidated, by an agreed sum or rate of damages is fully recognized by all the authorities. This does not apply to cases where the damage is fixed by law, as in case of damages in failure to pay money stipulated, because in these cases the damage is not in its nature unliquidated, but the rule of damages is fixed with regard to considerations of public policy. It will not be necessary to consider the various exceptions depending on the same general principle above stated, as they do not affect the present case.

In cases where the parties are at liberty to fix the measure of damages by an agreed sum or rate, the question is one of intent merely. When the parties declare that the sum or rate fixed shall be deemed liquidated damages, and the case is one in which they are at liberty so to declare, such declaration must stand unless inconsistent with other parts of the same instrument or unreasonable in itself.

In inquiring whether it is reasonable it is not necessary to ask whether it is wise or considerate, but whether it is in conflict with the principles and practices that govern transactions of a like nature. This certainly cannot be affirmed of the present stipulation. It does not fix a round sum incapable of adapting itself to the degree of failure to perform, but a rate by which a greater or less failure might be measured. We cannot say from anything before us that that rate is either more or less than the actual damage that could be proved. We have a measure of damage in part in the

agreed rate of commissions, but we cannot say from the record that there was no other measurable element of value to the plaintiffs in the consignments of cotton than the commissions to be earned. General experience, if we could resort to it, would lead to an opposite conclusion.

It was perfectly reasonable, in providing for further mercantile transactions that might be interrupted by unforeseen circumstances, that the parties should fix a rule of liability by means of which, in case of failure to perform, their accounts might be adjusted without the necessity of a law suit.

When the contract, according to its intention, is one of liquidated damages, it becomes necessary, before applying such rule of damage, to inquire whether the breach and the damage in any particular case is of the kind in the contemplation of the parties in fixing the measure of liability. While many cases have arisen where the resulting damage has been found so essentially different from that contemplated by the parties as to defeat the apparent intent of the contract in that respect, [*Higginson* vs. *Meld*, 14 Gray, 156,] the present case is free from any such aspect. The case that has arisen is obviously the very case contemplated by the parties in fixing the measure of liability imposed. We find nothing to prevent the express declaration of the parties in this respect from having its full force and effect.

The plaintiffs are entitled to the sum stipulated in respect of each bale which the defendants V. & M. failed to ship in accordance with their contract in addition to the sum already referred to.

The decree and the report of the Referee must be set aside so far as they conflict with the foregoing determinations and the cause remanded for further proceedings conformable herewith.

*McIver*, A. J., and *Haskell*, A. J., concurred.